UNITED STATES, Appellee,

v.

Paul George GAMACHE, Defendant,
Appellant.

No. 97–2418.

United States Court of Appeals,
First Circuit.

Heard June 4, 1998.
Decided Aug. 5, 1998.

Michael J. Sheehan, by appointment of the Court, for appellant.

Jean B. Weld, Assistant United States Attorney, with whom Paul M. Gagnon, United States Attorney, and Arnold H. Huftalen, Assistant United States Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge, STAHL, Circuit Judge, and ROSENN,* Senior Circuit Judge.

TORRUELLA, Chief Judge.

This appeal presents some serious and disturbing issues which are both constitutional and substantive in nature. Appellant was charged and convicted in a jury trial in which it was alleged that he traveled in interstate commerce for the purpose of engaging in an illegal "sexual act" with minors, in violation of 18 U.S.C. § 2423(b), and that he attempted to use a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of that conduct, in violation of 18 U.S.C. § 2251(a). Upon his conviction, appellant was sentenced to a term of imprisonment of 60 months.

Five issues are raised on appeal, but because of our disposition of this case, only two need be decided by us. These are: (1) whether, as applied in this case, 18 U.S.C. § 2423(b) withstands a constitutional challenge based on the contention that it at-

* Of the Third Circuit, sitting by designation.

tempts to punish "mere thoughts," and (2) whether the district court committed reversible error by not giving any jury instruction on the question of entrapment, notwithstanding appellant's request for such an instruction. We conclude that, as applied to the facts of this case, the challenged statute punishes conduct, not "mere thoughts" as is claimed, and thus that it passes constitutional scrutiny. However, we reverse appellant's conviction on both counts because we are of the view that he was entitled to have the jury instructed as to the defense of entrapment, and that the trial court's failure to give the instruction substantially affected his rights to a fair trial.

## A.  *The Background Facts*

In May 1995 a detective in the Keene, New Hampshire Police Department, as part of a sting operation aimed at uncovering child exploitation, placed a classified advertisement in the personal section of the *Tri–State Swingers* magazine which read as follows:

> FEMALE–TROY, NH; F.F.-female, 31; Single mom, two girls, one boy, seeks male as partner and mentor, seeks fun, enjoys travel and photography, FF P.O. Box 771, Troy, New Hampshire, 03465. .

Approximately 104 responses were received by the detective, who in turn answered the 97 individuals who sent addresses. Among those was appellant, then a 55-year old resident of Brunswick, Maine, who was employed as a service worker with the Maine Yankee Nuclear Power Plant.

Because of the nature of the issues raised we are required to reproduce in sordid detail the various epistolary exchanges that ensued between appellant and the detective.

This first response from appellant, which is postmarked October 14, 1995, stated in its relevant parts:

> Your ad interested me. Being your ad is in a swingers mag—I will assume that you would be willing to swing. With that, I'll describe myself. . . . I enjoy hunting, fishing & camping. I am looking for someone to join me in the pursuit of happiness. If you are that person, then maybe we should meet & discuss the situation. I can travel or you could come here. Please send pho-

> to & tell me about yourself. If I interest you send phone # and I'll call you to set up a date.

The detective answered on October 18, 1995:

> I am assuming that you responded to my ad in part to be a mentor to my children and you are interested in family fun. I am hoping that you think liberally about sex. My family is very comfortable in front of the camera . . .

At trial the detective testified that the use of the word "mentor" in the advertisement was purposeful in order to draw out only persons who were interested in "inter-generational sexual interaction between adults and children." Appellant testified, however, that after looking the term "mentor" up in the dictionary, he concluded that it meant "like role model," that "it was just another gal looking for somebody to take care of her kids like they do nowadays all over the country . . . [f]inancially, take them fishing, hunting, whatever."

Appellant next wrote the detective a lengthy letter, postmarked October 23, 1995:

> I find no problem, being a mentor to your children & yes family fun does interest me. I hunt, fish & go camping, in fact I just bought a camper yesterday & am getting it ready for next weekend. My son & friend & I are going up north to deer hunt. . . . I also have a high speed bass boat—I fish in tournaments, I am very outdoorsie. Also do ice fishing. I also have a camper on my truck, so whenever your ready to meet me, we could meet at a certain location & be comfortable.

> You say you hope I am liberal about sex, I am not exactly sure of what you are referring to in this area. So I guess I'll tell you what I think about sex. First off let me tell you, that I am an easy going person, I enjoy life to the fullest. I am not a jealous person & do not like arguing or fighting. I do not do drugs, only beer & my smokes. Sex to me is very special. Before I got married in the early 80's I had a girlfriend & we both were into the swinging scene. We are/were both bi, it was one of the best periods of my life—I met some real nice couples & we had many moments of pure

enjoyment, in fact my swinging friends were better friends than my straight friends ...

The great part was not only did we enjoy the sexual part, but we also did other non sexual things together, cookouts, camping & saunas. Yes F.F. I consider myself to be ultra liberal about sex ... Oh yes, I forgot, I enjoy going to the nudist camp in your fine state—but at present being single—they don't allow single males ...

Well F.F. I've told you about me—now its your turn to tell me about you. Some of my questions I have of you are:

1. What is it your looking for in life if it was with me?

2. What are your interests?

3. Are you a bisexual woman?

4. Tell me about your family. Oh yes—you said your family is very comfortable in front of the camera—what are you referring to?

5. Could you send a photo of yourself, nude preferred, but not required. Also one of the family.

6. Do you use drugs, smoke or drink?

7. What kind of personality do you have?

8. What do you do for work?

9. Anything else that would be helpful in trying to get to know what you're like. For both our sakes, it will be much better to know all we can about each other and accept what is! ....  Well F.F. I guess I've told you about me, I hope in the near future, to hear about you ....

P.S. I was looking at the map—I think its about 3 hrs. drive to you. Again your options:

1. You and your family can come here.

2. I can meet you at your place.

3. Anywhere in between.

On November 1, 1995 the detective returned this communication:

I am glad you agree with the liberal upbringing of children, My 12–year–old son, and his 10 and 8–year–old sisters all practice nudism in our home. They are very comfortable being naked in front of one another ... What I am talking about when I speak of family fun is that all of my children freely involve themselves in sex training sessions. Some of these training sessions have been photographed. The kids love to see themselves on video. I am very interested in introducing an adult male to further my children's sexual education and experiences. When I was a young girl my uncle was very kind to me and showed me the ways of love making. Let me know if you are interested....

For the first time in this series of exchanges, the detective answers as "Frances" instead of "F.F." Appellant picks up on this and other suggestions in his answer to this letter, which is also postmarked November 1, 1995:

You appear by your letters that you are trying to see if I am shocked by what you are telling me. I can assure you, that I am not shocked, I really think you are a super person & will have less problems with your children than most straight, prudish couples have with their kids. It sounds like your looking for another uncle like you had, to give your children the same experience as you had—a loving, caring person.

The way I look at all this—as everyone is willing to learn about sex & is not forced, what harm is done? None as far as I am concerned....

You say you are very interested in introducing an adult man to further your children's sexual education & experiences. Frances I would be honored, if you choose me to be that adult man.

Also Frances, as I told you, aside from the sex department—I am looking for a family type life, camping, fishing, hunting, sharing the ups & downs of what life has to offer....

Could you send me a picture of you & the children? ... I guess I am trying to get a mental picture of you & the children....

This thought just came into my mind—you said the children freely involved themselves in sex training sessions, do you have sex with them? Have you introduced your son to orgasm? What are your goals—Teaching them straight sex, or bi-sex too?.... I want to have a better understanding of what you desire of me....

Approximately two weeks later, on November 14, 1995, "Frances" wrote in return, again indicating that she wanted "to expand [her] children's education and experience." "She" also indicated that "she" shared appellant's nude photograph with them, and that they were "very excited about meeting" him. "Frances" introduces her "children," "Steve," age 12, "Jenny," age 10, and "Sarah," who is "just about to turn 8." The letter went on to say how she participated "during sex training with [her] children," and proceeded to describe the nature of these activities, and what was expected of appellant in this respect. The subject of the "uncle" was again raised, and "Frances" stated, "I hope my children can gain the same type of experience through someone like you." The clincher comes at the end when "Frances" expresses her desire to know appellant "for real. Maybe you have a video camera or have access to one, let me know."

Appellant's answer, postmarked November 20, 1995, is addressed to "Frances, Steve, Jenny, & Sarah." Appellant expresses his understanding of "Frances'" request for secrecy, "as we all know, it is against the law to be having sex with minors".... As to "Frances'" last suggestion, however, appellant states:

> No I don't have a videocamera or access to one, I don't know anything about them. But when we get together, I'll take you out & you pick the one you like & I'll buy it. I always thought about getting one—but again I don't have a clue as to what make, model or anything about them. You seem to have knowledge—So it will be your job to pick one out.... I do understand when you say you want to weed out weirdos & people who would want to hurt your children.... I do not consider myself a pervert or a child molester....
>
> You ask if I had any experiences & my feelings with young people.
>
> 1. I get along very well with all my grandchildren, I've always been like a magnet with kids. They seem to accept me very well.
>
> 2. No Frances I've never had an opportunity to experience family fun before.

> 3. The closest I came to having one was when I was around 11 or 12.... [He recounts an experience with his stepmother]....
>
> You asked if I am completely opposed to sexual touching with Steve? Frances, ... I am bi-sexual! If Steve is interested & wants to learn the pleasures of bisexuality I'd be more than willing to touch, stimulate & have oral sex with him....

"Frances" next communicated with appellant on November 28, 1995. In this letter "she" again referred to the "uncle [who] taught [her] about sex when [she] was very young, and wanting "the same type of experience for [her] children." "Frances" also tells appellant that she is not interested in finding a partner for herself "right now" as she is interested "in introducing an adult to educate [her] children." "She" indicates that she has been involved with their sexual education:

> The kids really enjoy being in front of our video camera. I would suggest you send a video of yourself so the children can see
> . . .
> P.S. I would suggest you buy any of the new and smaller camcorders. Any model will do. Let us know which one you pick out, they are all good.

Appellant wrote back in a letter postmarked December 1, 1995. He suggested that they meet for a "get acquainted" meeting at McDonald's or Dunkin' Donuts on his way back from a trip he was making to Connecticut. He wanted to know if in fact "Frances" was a woman:

> I hope you understand this. Your ad in TriState you asked for a partner and mentor for your children, now in this last letter you say your not interested in finding yourself a partner, rather you are more interested in finding an adult male for the children to educate them, I guess you really want an adult sex toy for kids.... I want you to know that I would be happy to be used as your toy for the further education of your children in the world of sex. I've thought about you all daily & have even come up with what I think is a good idea for the 1st class that the children and I could have—If your interested, tell me &

in the next letter, I'll give you a graphic detail of what the class would consist of!

Appellant then asks "Frances" a series of questions about the sexual experiences of the "children." And finally:

I am happy to hear you say you don't want to force me to do anything I don't feel comfortable with. The only thing I don't feel comfortable with is the buying [of] a camcorder & sending a video. As I already told you, I don't have a clue about them or how to operate them. . . .

"Frances'" next letter is dated December 11, 1995. "She" encloses a photograph of "herself" and reiterates that "she" is "mainly interested in finding some one who can sexually educate ["her"] children through having sex with them." The letter then states that:

I realize that this is something not everyone can do or feel comfortable with. Let me know if you feel all right with this. Maybe if you send a letter directly to the kids telling them about sex and what you hope to do with them when we all meet would be good.

"She" then goes on to describe the "children's" sex experiences up to then, and that he should decide what he should do.

Appellant next sent "all of you" a Christmas card post marked December 18, 1995 in which he stated that he wished he "could have been your Christmas present laying under the tree. Maybe next year."

On that same date appellant also wrote a lengthy letter directed to "Frances," which *responds to* "her's" of the 11th:

I do want to thank you for the picture. You are a very attractive lady, along with having very sensual eyes, I envy your uncle that you told me about—He was a very lucky man. My hope is someday I may be as lucky. Yes my dear, I know—you're not interested in me—but rather for the kids. I was just letting you know how I feel.

Appellant then goes on to explain, at length and in detail, how he will carry about the sexual "education" of "Frances'" "children". He ends by telling "her" that "[t]he next letter will be for the kids—let them open it so it can be kind of personal for them."

True to his word appellant next writes "Steve, Jenny, and Sarah" in a letter postmarked December 19, 1995, in which no words are spared describing the sexual activities that will take place when "they" "begin having classes in the very near future—before they get married—Ha, Ha." (underlining in the original). Appellant ends the letter by asking "them" for a photograph, which "[does not] have to be nude unless you'd like to."

"Frances" responded on December 22, 1995:

The kids really liked your letter and had a lot of questions about when we will all get together and the things you wrote about . . . If you are still willing we would love to have you come and meet with us . . . A motel would be nice. I would like to meet in Keene, New Hampshire. I will leave the planning up to you. The kids told me that they would love to have oral sex with you the first time and any pictures or videos that are taken will be given to you as a gift.

On December 28, 1995, appellant answered "Frances, Steve, Jenny, & Sarah" to the effect that "[t]he fact that you all want to meet with me, make love & a beautiful film is more than I could ever hope for. I promise I will do all in my power to make you all happy, both in the sexual department & also in normal life activities, if you will let me." He goes on to state that "this will be a new experience for me as well." The rest of the letter deals mainly with the arrangements for the meeting, which appellant suggests take place at the Troy (N.H.) Post Office. He proposes that, from there, all of them travel to Keene. Appellant ends by asking for a "regular picture of the kids to put on [his] dresser" next to "Frances'."

"Frances" answered on January 3, 1996, indicating that the "kids" were "very excited about your being involved in their sexual sessions and your bringing a video camera to make a film. Since it will be our first time you may keep the film." "She" was not agreeable to the Troy suggestion, however, and insisted on a motel in Keene. As to the request for the "children's" photo, "she" also

rejected the request and told appellant that he was "free to take as many pictures as you want when we meet."

Appellant's final letter is postmarked January 3, 1995, and again it is addressed to "Frances, Steve, Jenny & Sarah." The final plans for the meeting are proposed, with the date of January 20th and the "Super 8 Motel" in Keene being suggested as the time and place to meet. Appellant draws a map with directions as to how to get there and indicates that he will sit in his truck in the parking area until "they" come along side him. Then he will get out and approach "them." He includes a photograph of his truck so "they" will recognize it.

In the last of this distasteful correspondence, dated January 16, 1996, "Frances" tells appellant that everything is on course for the meeting but that "our video camera is broken so I will leave the video or pictures (your choice) up to you."

The line and bait cast, all that remained was the setting of the hook.

On the appointed date, appellant drove from his home in Maine to Keene, New Hampshire, arriving at about 1:00 p.m. at the parking lot of the Super 8 Motel in that town, where he parked his truck awaiting the arrival of "Frances" and the "kids." Observing his arrival, however, was the Keene detective who had commenced the events that eventually led to this encounter. Upon matching appellant's vehicle with the Polaroid photo that Gamache had sent "Frances" on January 3, which showed a pickup truck with a camper, the detective and other accompanying police officers approached appellant, who had remained seated in the vehicle, and proceeded to arrest him and to execute an anticipatory search warrant that had been issued against appellant and his vehicle.

Inside the cab were found bags of snacks and candy, several two-liter bottles of soda, a bottle of wine, eleven styrofoam cups, a jar of mixed nuts, a vibrator, a Polaroid camera loaded with film, ten extra cartridges of film, nine condoms, a lubricating jelly tube, a partially used tube of jelly, and a number of items conflictingly described as "small condoms" by the detective and as "finger cots" by appellant, who testified at trial that they are used to protect injured fingers. Several of these latter items were also found in appellant's pockets, within a plastic bag which also contained jelly and adult condoms.

While this incident was developing, the Brunswick, Maine police were executing a search warrant of appellant's home, where they found a road map with the town of Keene circled, "Frances'" letters to appellant, and a note on a marker board in the kitchen, written by appellant's roommate, telling him not to forget his camera. However, they found no evidence that appellant was interested in, or had a history of, the exploitation of children or child pornography.

B. *The Constitutional Challenge to 18 U.S.C. § 2423(b)*

Section 2423(b) provides that:

A person who travels in interstate commerce, or conspires to do so ... for the purpose of engaging in any sexual act (as defined in § 2246) with a person under 18 years of age that would be violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States shall be fined under this title, imprisoned not more than 10 years, or both.

Count I of the indictment, which deals with this provision, charges appellant with having traveled in interstate commerce from Maine to New Hampshire for the purpose of engaging in an illegal sexual act with a person under the age of 18. It is not at issue that the acts in question are within the definition of illegal "sexual act[s]" as defined in 18 U.S.C. § 2246(2).

On the one hand, appellant alleges the invalidity of this statute because according to him, it criminalizes "mere thought," yet, on the other hand, he claims that it is "unconstitutional in that it criminalizes one who crosses a state border with a sinister intent, without needing to prove any other act." These really are different and somewhat inconsistent arguments, which we address separately, but which in any event are unavailing to appellant.

Whether it is constitutionally permissible to criminally punish "mere thought" may pose an interesting subject for academic discourse, *see Steffan v. Perry,* 41 F.3d 677, 713–14 (D.C.Cir.1994); LaFave & Scott, *Criminal Law* § 25, at 177–79 (1976), but, as can be seen from our recitation of the practically undisputed facts in this appeal, that is not the way this statute is being applied to appellant. Appellant did not abstractly contemplate crossing state boundaries with a thought to committing a crime upon reaching his destination. Appellant did not merely sit in the quiet of his house, contemplate evil thoughts, and then flip the channels of his television set, and continue blithely with other musings. Appellant is not charged, nor does this statute, as applied, punish mere voyeurism.

As the record clearly establishes, appellant, at a minimum, engaged in a *series of acts* long past the "mere thinking" stage. *See United States v. Price,* 134 F.3d 340, 351 (6th Cir.1998) ("[B]ecause of the ... danger of convicting for mere 'thoughts' ... we require that the 'substantial step' consist of 'objective acts.' "). This series of acts includes the interchange of extensive correspondence that eventually led to the actual trip and that shows that at some point he became an active participant in the planning of this trip; the purchasing of supplies, and their transportation in his vehicle (supplies which, it could be argued, were designed to be used to carry out his allegedly nefarious purposes); and his actual traveling to the subject place, on the subject date, at least arguably (if you interpret the evidence in favor of the Government, *see United States v. Loder,* 23 F.3d 586, 589 (1st Cir.1994)), ready, willing and able to carry out his "educational" mission. Given these circumstances, it can hardly be claimed that punishment for "mere thought" is at issue.

■ The variation of this "thought crime" theme to the effect that the statute is unconstitutional because "it criminalizes one who crosses a state border with sinister intent, without the need to prove any *other* act" (emphasis supplied) demonstrates an inconsistency with the argument that "mere thought" is being punished. The "other" act

language concedes that at least *one* act took place, i.e., crossing a state line, which is something more than "mere thought". An alternate interpretation of this claim presupposes that Congress cannot criminalize a single act. This is a novel theory for which we can find no support. One clearly defined act is sufficient. In this case, the act is "traveling in interstate commerce," a phrase which supplies not only the jurisdictional basis for the federalization of the proscribed conduct, but also the "objective act" that facilitates the proof of the intent, together with the other evidence introduced. *See Hoke v. United States,* 227 U.S. 308, 323, 33 S.Ct. 281, 57 L.Ed. 523 (1913) (similar language in the Mann Act constitutional); *United States v. Vang,* 128 F.3d 1065, 1073 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1107, 140 L.Ed.2d 160 (1998) (§ 2423(b) constitutional); *United States v. Delpit,* 94 F.3d 1134, 1149 (8th Cir.1996) (similar language in the Murder–for–Hire Statute upheld); *Price,* 134 F.3d at 351. On this last point, of course, just crossing the state border is not enough: the Government must also prove that the crossing was made with the intent to engage in the proscribed conduct.

Proof of intent naturally means proving state of mind, but that does not mean that one is punishing "mere thought" any more than that the requirement of proving *mens rea* in most crimes means that one is solely punishing "mere thought." Now, undoubtedly, establishing intent, short of a situation in which it is admitted, is difficult and usually depends on the use of circumstantial evidence. *See id.* But as we all know, circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given under the circumstances within which it unfolds. In any event, difficulty of proof is not a valid criteria for determining the constitutionality of the present statute.

Appellant's challenge in this respect is not well taken and is rejected.

### C. *The Entrapment Issue*

Appellant fares better on his entrapment argument.

■ A properly preserved request for an entrapment instruction will be reviewed plenarily on appeal.[2] *See United States v. Rodriguez,* 858 F.2d 809, 812 (1st Cir.1988).

■ A criminal defendant is entitled to an instruction on his theory of defense so long as the theory is a valid one and there is evidence in the record to support it. *See id.* In making this determination, the district court is not allowed to weigh the evidence, make credibility determinations, or resolve conflicts in the proof. Rather, the court's function is to examine the evidence on the record and to draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can *plausibly* support the theory of the defense. *See id.; see also United States v. Montanez,* 105 F.3d 36, 39 (1st Cir.1997). This is not a very high standard to meet, for in its present context, to be "plausible" is to be "superficially reasonable." *See Webster's Third New International Dictionary,* at 1736 (1971).

■ Entrapment occurs "when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932). This defense has two elements: (1) improper Government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal conduct. *See Montanez,* 105 F.3d at 38; *United States v. Gendron,* 18 F.3d 955, 961 (1st Cir.1994). The defendant carries the initial burden of producing *some* evidence of both the Government's improper inducement, and the defendant's lack of predisposition to commit the alleged offense, so as to "raise a reasonable

doubt as to whether he 'was an unwavering innocent' rather than an 'unwavering criminal.'" *United States v. Joost,* 92 F.3d 7, 12 (1st Cir.1996).

■ "Inducement" exists when the governmental deception or instigation actually implants the criminal design in the defendant's mind. *See United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Inducement may include persuasion, false statements, or other governmental conduct that creates a risk of causing an otherwise unwilling person to commit the crime charged. *See Gendron,* 18 F.3d at 961–62.

■ A "sting" operation is not improper inducement if it merely provides an opportunity to commit a crime, but proof of opportunity plus "something else" may be adequate to meet a defendant's burden. *See Joost,* 92 F.3d at 12. Examples found sufficient by courts include threats, forceful solicitation and dogged insistence, and repeated suggestions. *See id.*

■ Once the defendant makes a showing of inducement and lack of predisposition, the Government must prove defendant's predisposition to engage in the charged criminal activity, beyond a reasonable doubt. *See Waker v. United States,* 344 F.2d 795, 796 (1st Cir.1965). Factors to be considered by the court in assessing whether the defendant was predisposed to commit the crime charged are: (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by the governmental persuasion;

2. The Government argues that the defendant never specifically articulated an entrapment defense to the jury and thus that the record is barren of evidence that warrants an entrapment instruction. The Government contends that, instead of presenting an entrapment defense, Gamache disclaimed that he committed any crime at all. Therefore, the Government asserts, he never claimed improper inducement or lack of predisposition. This argument seems to imply that a defendant who claims innocence cannot seek an entrapment instruction. This is not the law. The Supreme Court has held that "even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews v. United States,* 485 U.S. 58, 65, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). Thus, we must look to the record and determine whether there is evidence from which a jury could infer that Gamache was entrapped.

and (5) the nature of the inducement or persuasion offered by the Government. *See United States v. Busby,* 780 F.2d 804, 807 (9th Cir.1986).

Two recent decisions—one from the Supreme Court and the other from this Circuit—have delineated more precisely the contours of the entrapment defense. In *Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), the Supreme Court held that Jacobson had been entrapped as a matter of law when government agents engaged in a campaign of phony mailings, which involved seven or eight mailings spanning a 26–month period, that induced him to violate the federal ban on child pornography by purchasing two illegal pornographic magazines. After reviewing the Government's persistent encouragements, which included letters from fictional lobbying organizations that claimed to promote sexual freedoms, the Supreme Court found that Jacobson's "ready response to these solicitations cannot be enough to establish beyond a reasonable doubt that he was predisposed, prior to the Government acts intended to create predisposition, to commit the crime." *Id.* at 553, 112 S.Ct. 1535.

In *United States v. Gendron,* 18 F.3d 955 (1st Cir.1994), then Chief Judge (now Justice) Breyer provided our "most useful discussion" of the entrapment defense post-*Jacobson. United States v. Acosta,* 67 F.3d 334, 337 (1st Cir.1995). We explained that the Government "sting" in *Jacobson* did more than simply offer an "ordinary opportunity" to buy child pornography. Rather, that sting combined an ordinary opportunity with certain "extra elements" so that there was a "risk of catching in the law enforcement net not only those who might well have committed the crime elsewhere (in the absence of the sting), but also those who (in its absence) likely would never have done so." *Gendron,* 18 F.3d at 961. We then identified three such "extra elements." First, the Government's operation "reflected a psychologically 'graduated' set of responses to Jacobson's own noncriminal responses, beginning with innocent lures and progressing to frank offers." *Id.* at 962. Second, the Government's solicitations appealed to alternative motives

(*i.e.,* anti-censorship motives), *see id.,* which suggested that the illicit conduct was "something the [defendant] ought to be allowed to do," *Jacobson,* 503 U.S. at 553, 112 S.Ct. 1535. Third, the Government's efforts stretched out over two years. *Id.*

Without unduly repeating the details of this depressing record, we survey the relevant evidence. It is undisputed that the Government initiated this victimless incident with its advertisement. Thereafter, a stream of correspondence followed even after it became apparent, from the initial letters, that appellant was on a different wavelength than the detective. Appellant was interested in having sex with the adult "Frances." His initial response was directed to "F.F."/"Frances," not her "children." What each understood "mentor" and "family fun" to mean, at least at the beginning, was very different, and this can be garnered not only from reading the correspondence, but also from both the detective's and appellant's testimony at trial. Appellant ultimately became ensnared by the detective's artifice. The record is clear that it was the Government's insistence and artful manipulation of appellant that finally drew him into the web skillfully spun by the detective. To this we must add that it was appellant's contention, and he so testified, that all of his correspondence about sex with minors was a ruse to have sex with "Frances," who was his target from the time that he answered the ad. Although this version is obviously disputed by the Government, that is irrelevant to the question of whether it raises an issue of entrapment to be put before the jury.

Furthermore, appellant had no criminal record, particularly as to the child molestation, exploitation, or any related matter. In fact, on the stand, the detective testified that appellant did not even fit a pedophile profile and that there was no evidence that linked him to prior sexual activities with children. It was the Government that first mentioned the "children" as sex objects; it was the Government that first used sexually explicit language involving the "children"; it was the Government that escalated the subject of sex with children; and it was the Government

that first brought up the use of photographic equipment.

As to the latter, the entrapment issue becomes even more apparent with respect to the allegations of attempted manufacture of child pornography. Appellant's response to "Frances'" suggestion of using a camera reveals how far photography was from his cerebrations or fantasies when he wrote: "No, I don't have any videocamera or access to one, I don't know anything about them." The record is redundant with the Government's relentless reiteration of the subject to a person that was patently ignorant of this activity, even to the very last moment.

Turning first to "inducement," we think that, in light of our analysis in *Gendron*, the evidence of improper inducement here was sufficient to submit the question to the jury. First, Gamache initially expressed only his desire for a sexual relationship with Frances and his intent to form a non-sexual relationship with her children. In addition, the agent here manufactured the aura of a personal relationship between Gamache and the fictional "Frances," and "Frances" disclosed her fictional illicit intentions only well into the correspondence. These solicitations are quite similar to the type of "psychologically graduated" responses that the *Jacobson* Court found objectionable. Second, the government agent provided justifications for the illicit activity (intergenerational sex) by describing "herself" as glad that Gamache was "liberal" like her, expressing that she, as the mother of the children, strongly approved of the illegal activity, and explaining that she had engaged in this conduct as a child and found it beneficial to her. These solicitations suggested that Gamache ought to be allowed to engage in the illicit activity, just as the Government in *Jacobson* used a fake lobbying organization to appeal to anti-censorship motives. Finally, the Government's sting commenced in May 1995 and did not result in any illegal conduct until January 1996. Thus, the Government persevered for almost seven months to elicit the offense conduct. In *Gendron*, we observed that, in *Jacobson*, the Government had conceded that its methods amounted to an "improper inducement" as a matter of law. *Gendron*, 18 F.3d at 963

(citing *Jacobson*, 503 U.S. at 549 n. 2, 112 S.Ct. 1535). We think that these "extra elements" are sufficient to satisfy the defendant's burden on the inducement prong. *See id.* at 961.

Turning to the predisposition prong, under the analysis set forth in *Jacobson*, a reasonable jury could find that Gamache was not predisposed to commit the offense. "[P]roof that [the defendant] engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing." *Jacobson*, 503 U.S. at 551 n. 3, 112 S.Ct. 1535. As we explained in *Gendron:*

The evidence of predisposition [in *Jacobson*] consisted of two facts: (1) that before the government became involved Jacobson was on a private bookstore mailing list for dubious photos; and (2) that he responded affirmatively to the government's solicitations. The first fact ... showed little about a predisposition to act unlawfully because ordering the photos was lawful at the time..... The second, placing orders, could not show how Jacobson would have acted had the solicitation lacked ... the improper appeals to anti-censorship motives, the graduated response, and the lengthy time frame. [As a result,] the government's evidence did not show how Jacobson would have acted had he been faced with an ordinary "opportunity" to commit the crime rather than a special "inducement."

*Gendron*, 18 F.3d at 963. As in *Jacobson*, Gamache initially expressed an interest in unusual sexual activities, but these activities were not illegal with Frances. Nor is the inference permissible that the tendency to engage in unusual, albeit legal, sexual activity with an adult indicates a predisposition towards pedophilia.

The Government responds that Gamache's enthusiastic response, as expressed in the correspondence, in conjunction with the lack of coercion and/or affirmative pressure by the Government agent, is enough to take the entrapment defense away from the jury. We disagree. Gamache's stated willingness to

commit the crime, although clearly relevant to the jury's inquiry, is not sufficient by itself to mandate a finding that he was predisposed. As Judge Posner explained:

> Had the Court in *Jacobson* believed that the legal concept of predisposition is exhausted in the demonstrated willingness of the defendant to commit the crime without threats or promises by the government, then Jacobson was predisposed, in which event the Court's reversal of his conviction would be difficult to explain. The government did not offer Jacobson any inducements to buy pornographic magazines or threaten him with harm if he failed to buy them. It was not as if the government had had to badger Jacobson for 26 months in order to overcome his resistance to committing a crime. He never resisted.

*United States v. Hollingsworth*, 27 F.3d 1196, 1199 (7th Cir.1994).

Furthermore, as we have noted, there was no evidence presented that Gamache had engaged in similar activities independent of this sting operation. The jury could have relied on this evidence to find a lack of predisposition because the concept of predisposition has a definite temporal reference: "the inquiry must focus on a defendant's predisposition before contact with government officers or agents." *United States v. Brown*, 43 F.3d 618, 627 (11th Cir.1995) (citing *Jacobson*, 503 U.S. at 547 n. 2, 112 S.Ct. 1535); *see also United States v. Gifford*, 17 F.3d 462, 469 (1st Cir.1994) (identifying as "critical" the time "in advance of the government's initial intervention"). All of the Government's circumstantial evidence bearing on Gamache's intent when he crossed the state line resulted from the Government's initial contact. The argument is clear in regard to his conviction for attempting to use a minor to engage in sexually explicit conduct for the purpose of producing visual depictions. Despite the Government's dogged insistence that Gamache bring a video camera, Gamache professed ignorance about such cameras and resisted purchasing one. There is no evidence independent of Gamache's correspondence with the government agents—other than perhaps "small condoms" found on the defendant (which the defendant testified were "finger cots" that protected injuries to his fingers)—that indicated a predisposition to engage in illegal sexual contact with minors prior to, and apart from, the correspondence. And while "ready commission of the criminal act can itself adequately evince an individual's predisposition" and thus provide sufficient evidence to support a *jury's* finding that the defendant was predisposed to commit the offense, *Gifford*, 17 F.3d at 469, eagerness alone, when coupled with the "extra elements" present in this sting operation, is not sufficient to remove the predisposition question from the jury's purview.

We conclude that appellant met the dual burdens required for an instruction on entrapment, because the evidence raises a reasonable doubt that the Government improperly induced a citizen to commit crimes that he was not predisposed to commit, yet crimes for which he was charged and convicted. "[E]ven where there are no credibility issues or tensions in the evidence—and some do exist here—entrapment is treated as an issue of fact for a jury." *Acosta*, 67 F.3d at 338. Although it is not dispositive of the issues before us, we take note of the fact that in sentencing appellant the district judge granted a downward departure from the Guidelines, based on his conclusion that appellant had engaged in "aberrant behavior," a conclusion that would seems to include some element of lack of predisposition.

The district court committed reversible error in not giving an instruction on the issue of entrapment. Appellant's conviction is *reversed* and a new trial is ordered.