# United States Court of Appeals
## For the First Circuit

No. 10-1719

UNITED STATES OF AMERICA,

Appellee,

v.

EDUARDO DÁVILA-NIEVES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Torruella, Boudin, and Thompson, Circuit Judges.

Héctor Luis Ramos-Vega, Assistant Federal Public Defender, with whom Héctor E. Guzmán, Jr., Federal Public Defender, was on brief, for Appellant.
Jenifer Yois Hernández-Vega, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Luke Cass, Assistant United States Attorney, were on brief, for appellee.

January 6, 2012

**THOMPSON**, **Circuit Judge**.  Eduardo Dávila-Nieves (Dávila) got caught attempting to induce a person he believed to be a minor to engage in sexual activity, and a Puerto Rico jury found him guilty of violating 18 U.S.C. § 2422(b).  Claiming multiple errors, he appeals.  As we find no merit to Dávila's arguments, we affirm.

## BACKGROUND

"The facts, though disturbing, are not greatly disputed.  Regardless, because [Dávila] challenges the sufficiency of the evidence, we recount them in some detail, and in the light most favorable to the verdict."  United States v. Berk, 652 F.3d 132, 134 (1st Cir. 2011).

In June of 2007, a thirteen-year-old girl, Y.G., received a cell phone call from Dávila, whom she did not know.  He asked Y.G. whether she was "the girl from the gas station."  Y.G. said she was not, but continued the conversation.  Before hanging up, Dávila said he would call her back later.  He did call back, and asked Y.G. her name and age.  Y.G. falsely said that her name was Margarita and that she was fourteen.  Dávila told her his real name, Eduardo, and his age, twenty-seven.  They talked into the early morning.

Dávila and Y.G. continued communicating by phone and using text messages.  Although the relationship started out as a friendship, Dávila steered their conversations to sexual matters.  If they spent time together, he said, they might end up having sex.  In phone conversations, Dávila discussed what he would do if they

had sex and how Y.G. would feel.  He also masturbated and asked Y.G. to touch herself.

Dávila made arrangements to meet Y.G. near her house on June 1, 2007.  On that day, Y.G.'s family was having a birthday party for her younger sister and Y.G. said she could slip out to meet him.  The meeting never happened because Y.G.'s uncle noticed a call that she received from Dávila.  When Y.G.'s uncle asked her about the call, she told him that it was from a twenty-seven-year old friend of hers whom she spoke with regularly.  He told Y.G.'s mother, who alerted the authorities.

Law enforcement officials began an investigation to corroborate Y.G.'s story.  They ultimately recorded several conversations between Y.G. and Dávila.  During those conversations, Dávila once again made plans to meet Y.G., this time at the movies.  Y.G. also told Dávila other information - her real name and age, where she lived, where she went to school, and what grade she was in.  Dávila said he wanted to take Y.G. to a motel where they could have sex.  Although a meeting was initially scheduled to take place on June 21, it was cancelled because law enforcement officials needed more information to confirm Dávila's identity and location.

## The Sting

Using Dávila's telephone number and records from the Puerto Rico Department of Motor Vehicles, law enforcement agents were able to verify Dávila's identity.  Once they confirmed that Dávila had engaged in sexually themed communications with Y.G., that

-3-

he was interested in meeting with her, and that he knew she was only thirteen, a sting operation targeting him commenced in earnest. To set up the operation, federal agent Rebecca González (González) instructed Y.G. to provide Dávila with an email address, which she did. Then, (pretending to be Y.G.) González sent an email to Dávila saying that Y.G.'s mom had found out about their plan to meet at the movies and had taken away Y.G.'s mobile phone. With no phone, she would have to channel her communications with Dávila through a thirteen-year-old friend, "Vanessa." Actually, "Vanessa" was a fictional character played by González.

Dávila responded by email: "Hello is [sic] you know who, forget it, I'll wait for your call or leave me a message." On July 2, González, still pretending to be Y.G., emailed Dávila asking if he had received a text message from "Vanessa." Dávila replied on July 9: "Greetings, I haven't got any message. I wanted to know if you have called me several times private. When ever [sic] you want we can meet, bye."

The trap had been set, but it would still be some time before it was sprung. In the meantime, there was almost a two-month break in communications between Dávila and law enforcement because González had to wait for her agency to provide her with an undercover phone. On September 5, 2007, González, pretending to be Y.G., reinitiated contact by emailing the fictitious "Vanessa's" mobile phone number (the new undercover phone number) to Dávila. Dávila called soon afterwards and throughout the rest of the month,

González, posing as "Vanessa," recorded four calls in which Dávila broached sexual topics and invited "Vanessa" to meet with him.

The operation seemed to be running smoothly until September 25, 2007. On that date, Dávila placed a late night 3 a.m. phone call to "Vanessa." Initially, she did not pick up the phone but eventually she called Dávila back. In the conversation that ensued, Dávila asked repeatedly whether "Vanessa" wanted him to hang up so she could go back to sleep. As the conversation progressed, Dávila disclosed that he was in Miami looking for a job and would be returning to Puerto Rico on October 9. He offered to buy "Vanessa" a plane ticket to come to Miami, but she declined the offer. After that call, communications between Dávila and "Vanessa" ceased for about seven months. During that period, the undercover cell phone González had been using was turned off.

The sting operation resumed again on April 24, 2008, when "Vanessa" emailed Dávila to let him know she had a new mobile phone. Dávila sent emails on April 27 and April 28 asking for the new phone number. During April and May, "Vanessa" and Dávila communicated using text messages and email. "Vanessa" asked Dávila for his mobile phone number on several occasions, but he did not provide one right away. According to González, this was because Dávila did not have a mobile phone at that time. However, Dávila did try to contact "Vanessa" by calling her from a restricted phone number. He also sent her an email stating that "I have called you several times restricted and you don't answer." "Vanessa" responded via

-5-

email on May 12 saying, "Hey, don't call me private because I don't know who it is, just in case I am with my mom. Give me your number or call today in the evening." On May 15, Dávila responded, "Every time I call you nobody answers it. What is more I'm not going to call, if you want to see me I'm going to be at the Fajardo basketball court in the TV transmission bus."

Two days later Dávila emailed "Vanessa" and asked her to open an account so they could chat using an instant messenger service. She responded on May 20, adding Dávila as a "buddy" on her "buddy list" and sending Dávila an email invitation to chat in real time using instant messaging. On May 23, Dávila texted "Vanessa" with a new mobile phone number and they resumed speaking by phone, in addition to communicating using text messages and email. Law enforcement officials recorded several calls between Dávila and "Vanessa" in May and June of 2008.

On May 28, Dávila installed a webcam and invited "Vanessa" to see a video image of him over the internet. When she accepted and could see his image, he asked her to rate how he looked on a scale from 1 to 10. When she said she could see him from the neck up, he said that what was missing was "for [him] to get undressed." Dávila mentioned that he had seen an online photograph of "Vanessa" in a bathing suit and that it "was not bad."[1] At this point, the

---

[1] As part of establishing her undercover persona as "Vanessa," González set up online profiles in which she posted actual pictures of herself when she was thirteen years old.

conversations between Dávila and "Vanessa" became more explicit.[2] Dávila said he had to "be beside [her] to teach [her]" and asked if she would let herself be "taught." "Vanessa" asked what he wanted to teach her and he said about the computer, messenger, "and other things," saying that "I am talking in double intentions." Dávila asked "Vanessa" if she would bathe him. He told her that when a rooster makes love to a chicken "it is called that the rooster steps on it" and asked her if she was "going to let the rooster step on [her]?" "Vanessa" told Dávila "I have never been with anyone." "Vanessa" said that a friend told her sexual intercourse hurts and that she bled. Dávila agreed but said that "afterwards its [sic] delicious" and "you are going to get hooked on how good it is and feels." Dávila offered to use condoms, telling "Vanessa" that "you're not going to have kids or diseases." He suggested that she "drink some beer so that [she] would relax" and then said he would bring beer and Smirnoff Ice beverages when they met.

During these conversations, Dávila expressed concern that "Vanessa" would "accuse" him "that [he] had relations with [her]" and that he would get sent to jail. Dávila then explained to "Vanessa" what it means to be a pedophile, which he described as "a man that goes to bed with girls, that is a crime." Dávila said, "I don't want to do you." "Vanessa" asked if Dávila had ever been with

_____

[2] We need not recount all the details of the sexually explicit conversations which followed. We include only some of the many examples from the record.

-7-

a girl her age. Dávila replied that he had already had sex with a fourteen-year-old, "and she loved it." When "Vanessa" asked if it hurt, Dávila said that it needs to be done "softly" and said he would bring tampons in case she bled. He requested "please, the only thing I ask you is that you don't hurt me." Dávila proceeded to discuss in detail the sexual acts he would perform on "Vanessa."

Dávila continued communicating with "Vanessa" for about two more weeks while law enforcement officials made recordings, which were eventually used as evidence at trial. On June 16, 2008, the trap finally snapped shut. Dávila told "Vanessa" that he had that day off from work and wanted to meet. Communicating by phone and chat messages, they arranged to meet at a toy store in a local mall. However, when Dávila arrived for the meeting, he was met by law enforcement and arrested. Law enforcement officials found a cooler in his car stocked with beer and Smirnoff Ice beverages.

**The Trial**

Dávila was charged with violating 18 U.S.C. § 2422(b).[3] The complaint alleged that Dávila used a means of interstate

---

[3] Section 2422(b) states:
Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.
18 U.S.C. § 2422(b).

commerce in an attempt to knowingly persuade, induce, and entice a thirteen-year-old to engage in sexual activity for which he could be charged with a criminal offense under Puerto Rico law.

At trial, the government presented numerous recordings and transcripts of phone conversations, transcripts of internet chat sessions, and emails between Dávila and "Vanessa." However, the government did not present any documentary or testimonial evidence about the Puerto Rico statute that criminalized Dávila's attempted behavior, P.R. Laws Ann. tit. 33, § 4770 (the "Puerto Rico statute").[4] Citing this omission, Dávila moved for a judgment of acquittal based on insufficient evidence under Rule 29 of the Federal Rules of Criminal Procedure. The government countered that it did not have to present evidence of the Puerto Rico statute, arguing that it is the trial judge who should set forth the statute in the jury charge. The district court agreed and denied Dávila's motion, referencing the fact that a court can take judicial notice of federal and state law and instruct the jury accordingly.

Dávila proceeded with his defense. Then, at the close of trial, he requested an entrapment jury instruction, which the government objected to. The district court declined to give the

---

[4] "Any person who performs sexual penetration, whether vaginal, anal, oral-genital, digital or instrumental under any of the following circumstances shall incur a severe second degree felony: (a) If the victim has not yet reached the age of sixteen (16) at the time of the event." P.R. Laws Ann. tit. 33, § 4770.

-9-

instruction. The court did, however, as requested by the government, read the Puerto Rico statute to the jury.[5]

After the jury returned a guilty verdict, Dávila renewed his motion for a judgment of acquittal. Alternatively he moved for a new trial, claiming that the court, when it took judicial notice of the Puerto Rico statute, erroneously failed to instruct the jury that it was not required to accept judicially noticed facts as conclusive. The district court denied both motions and this appeal followed.

To this court, Dávila advances three arguments. First, reiterating the insufficiency argument he made at trial and raising constitutional claims as well, Dávila contends that the district court should have granted a judgment of acquittal. Second, Dávila claims that he is entitled to a new trial because the court did not instruct the jury that it was not required to accept judicially noticed facts as conclusive. Finally, Dávila argues that the district court's failure to instruct the jury on his entrapment theory of defense also qualifies him for a new trial.

---

[5] The district court instructed the jury: "[I]n Puerto Rico the following is a criminal offense pursuant to article 142 of the Penal Code which reads: 'Sexual Aggression. Any person who engages in sexual penetration be it vaginal, anal, oral, digital or instrumental in any of the following circumstances. A, if the victim at the time of the events is less then [sic] 16 years old.'"

**ANALYSIS**

**Judgment of Acquittal**

To establish an offense under § 2422(b), the government must prove that a defendant (1) used a facility of interstate commerce (2) to attempt to, or to knowingly, persuade, induce or entice (3) someone younger than eighteen years old (4) to engage in criminal sexual activity. See United States v. Brand, 467 F.3d 179, 201-02 (2d Cir. 2006); United States v. Munro, 394 F.3d 865, 869 (10th Cir. 2005). The criminal offense requirement of element four may be defined by the laws of the states, see United States v. Dwinells, 508 F.3d 63, 72 (1st Cir. 2007), and here it is defined by P.R. Laws Ann. tit. 33, § 4470.

It is proof of this fourth element that Dávila claims was lacking. In particular, Dávila contends that because the government did not introduce the Puerto Rico statute into evidence, there was no evidence from which a reasonable jury could find that the behavior he attempted to engage in with "Vanessa" was criminal under Puerto Rico law.[6] Dávila then takes this argument one step further and asserts that by taking judicial notice of the Puerto Rico statute, the district court not only relieved the government of its burden of proof but also improperly suggested that the government

---

[6] To be clear, Dávila does not dispute that attempting to have sex with a minor is illegal under Puerto Rico law. Rather, his argument is that the government was required to introduce evidence proving beyond a reasonable doubt every element of the crime with which he was charged, and that because the government failed to introduce into evidence the Puerto Rico statute criminalizing his behavior, it failed to meet its burden of proof as a matter of law.

-11-

had proven the fourth element - that he engaged in criminal sexual activity - in violation of Dávila's due process and Sixth Amendment rights.

We review de novo a district court's denial of a Rule 29 motion for judgment of acquittal. United States v. Rodríguez-Lozada, 558 F.3d 29, 39 (1st Cir. 2009). In doing so, we do not weigh competing evidence; rather, we merely verify that some evidence adequately supports the jury's verdict. Id. We must affirm Dávila's conviction if, drawing all reasonable inferences in favor of the verdict, a jury could find that each element of the charged offense was satisfied beyond a reasonable doubt. United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010).

Here the evidence was sufficient. It is well established that district courts may take judicial notice of state law "'without plea or proof.'" Getty Petroleum Mktg., Inc. v. Capital Terminal Co., 391 F.3d 312, 320 (1st Cir. 2004) (quoting Lamar v. Micou, 114 U.S. 218, 223 (1885)). Further, "where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury." See United States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 49 (1st Cir. 2004).

Nonetheless, as is true in all criminal cases, the government has the burden of proving all elements of the charged crime beyond a reasonable doubt. Francis v. Franklin, 471 U.S. 307, 313 (1985). Thus, the government had to introduce sufficient

-12-

evidence of Dávila's conduct which, if the jury found it to be true, constituted criminal behavior under Puerto Rico law. That being said, however, the government (contrary to Dávila's assertion) was not required to introduce evidence as to the content of the Puerto Rico staute. See Getty Petroleum Mktg., Inc., 391 F.3d at 320. Rather it was proper for the district court to take judicial notice of the statute itself. See Fazal-Ur-Raheman-Fazal, 355 F.3d at 49 (citing United States v. Clements, 588 F.2d 1030, 1037 (5th Cir. 1979) (where violation of a state law is an element of the charged federal crime, a "court may properly take notice of a state law" and then "instruct[] the jury on the applicable law")); see also Hanley v. United States, 416 F.2d 1160, 1164 (5th Cir. 1969) (where violation of state laws is an element of the charged federal crime, it is appropriate for "government counsel to request the court to take judicial notice of the [state] laws and to instruct the jury regarding them"). Thus we conclude that the record (which included the judicially noticed statute) contained sufficient evidence from which a jury could reasonably conclude beyond a reasonable doubt that Dávila violated § 2422.

We turn to Dávila's constitutional arguments. In support of his claimed due process violation, Dávila points to the principle that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). With respect to the claimed Sixth

Amendment violation, Dávila contends that by improperly suggesting to the jury that the government had proven the fourth element of § 2422(b), the trial court deprived him of his right to have his guilt or innocence determined by a jury. See Duncan v. Louisiana, 391 U.S. 145, 149 (1968); United States v. Bello, 194 F.3d 18, 25 (1st Cir. 1999).

We agree with Dávila that because the right to a jury trial in a criminal case is so fundamental, "a court may not step in and direct a finding of contested fact in favor of the prosecution 'regardless of how overwhelmingly the evidence may point in that direction.'" United States v. Argentine, 814 F.2d 783, 788 (1st Cir. 1987) (quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 573 (1977)). However, this was not what occurred here. The trial judge did exactly what she was supposed to do – taking judicial notice of the relevant state law, she read it to the jury during her instruction and then left it to them to determine whether the government's evidence proved that what Dávila attempted to do with a fictional thirteen-year-old girl fit within the type of conduct criminalized by the statute. See Fazal-Ur-Raheman-Fazal, 355 F.3d at 49 (district court should have permitted the jury to apply the relevant facts to the state law to decide whether an element of the crime had been proven). There was no improper lessening of the government's burden or burden shifting. Dávila's constitutional rights were not infringed.

## 201(f) Instruction

Federal Rule of Evidence 201 provides that when a court takes judicial notice of an adjudicative fact in a criminal case, it "must instruct the jury that it may or may not accept the noticed fact as conclusive." Fed. R. Evid. 201(f).[7] Dávila faults the district court for its failure to provide this instruction in connection with its reading of the Puerto Rico statute. Although Dávila made this same argument in his motion for a new trial, he never requested such an instruction in advance of the jury charge. This is so despite the fact that the court indicated it could take judicial notice of the statute and explicitly stated that it would include the statute in the charge. We have considered the failure to request a jury instruction to waive the right to that instruction. See United States v. Alberico, 559 F.3d 24, 27 (1st Cir. 2009). Even assuming we were to review the court's failure to give the instruction for plain error, Dávila would not prevail. See id.

The short answer is that Rule 201 applies when a court takes judicial notice of adjudicative facts, not when it takes judicial notice of law, as it did here. See Fed. R. Evid. 201(a). Juries are required to follow the law as it is explained to them by the trial court. See Fazal-Ur-Raheman-Fazal, 355 F.3d at 49

_____

[7] At the time of trial, the rule was substantively the same; however, it was contained in subsection (g) and read as follows: "In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed." Fed. R. Evid. 201(g) (2009).

(quoting United States v. Gaudin, 515 U.S. 506, 513 (1995)).  It would be nonsensical for a trial court to take judicial notice of a particular state law, read it to the jury, and then instruct the jury that it may disregard that law.  There was no error, plain or otherwise.

## Entrapment Instruction

Entrapment is a judicially-created doctrine, which recognizes that Congress did not intend for law enforcement to implement statutes by tempting innocent people to commit crimes. United States v. Teleguz, 492 F.3d 80, 84 (1st Cir. 2007). "Entrapment occurs 'when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.'"  United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998) (quoting Sorrells v. United States, 287 U.S. 435, 442 (1932)).  Operations which merely give a defendant an opportunity to commit a crime, including sting operations, ordinarily do not constitute entrapment.  See Teleguz, 492 F.3d at 84.

According to Dávila, the court should have given an entrapment instruction.  Since Dávila preserved his objection below, we review the district court's refusal to instruct the jury on entrapment de novo .  United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009).  To be entitled to such an instruction, "a defendant must adduce 'some hard evidence' that (i) government actors induced

-16-

him to commit the charged crime and (ii) he was not predisposed to commit that crime." Id. (quoting United States v. Shinderman, 515 F.3d 5, 13 (1st Cir. 2008)). A defendant has the burden of producing some evidence of both prongs. Gamache, 156 F.3d at 9. "While this burden is 'modest', it 'requires more than self-serving assertions.'" Vasco, 564 F.3d at 18 (quoting Shinderman, 515 F.3d at 14). It requires that the hard evidence, "if believed, would lead a reasonable person to the requisite conclusion; it is not enough that there be doubt in the absence of evidence on a given point." United States v. Young, 78 F.3d 758, 760 (1st Cir. 1995).

When considering whether an entrapment instruction is appropriate, the district court may not make credibility determinations, weigh the evidence, or resolve conflicts in the proof. Gamache, 156 F.3d at 9. "The question is whether a reasonable jury could view the evidence as establishing that defendant was entrapped." Teleguz, 492 F.3d at 84. In so doing, the court must view the evidence in the light most favorable to the defense. Gamache, 156 F.3d at 9. With these parameters in mind, we first consider whether there was improper government inducement.

"To demonstrate inducement, a defendant must show not only that the government provided the defendant with the opportunity to commit the crime, but also the existence of a 'plus' factor that raises concerns of 'government overreaching.'" Vasco, 564 F.3d at 18 (quoting United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994)). Typical plus factors are "'excessive pressure by the

-17-

government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive.'" Young, 78 F.3d at 761 (quoting Gendron, 18 F.3d at 961). Courts have also found improper inducement when the government used intimidation, threats, or "dogged insistence." Vasco, 564 F.3d at 18.

Dávila's claim of improper inducement focuses on the fact that it was law enforcement that reinitiated contact with him (and not vice versa) after his first aborted meeting with Y.G. and again in April 2008, after a seven-month break in communications with "Vanessa." This government conduct, he contends, rose to the level of actually planting in his mind criminal designs that he had previously abandoned. Dávila further claims reluctance on his part pointing to statements he made to "Vanessa" such as: "I'm not going to call"; "I don't want to do you"; "you are a minor"; and "you want me to hang up?".

Not true, says the government, countering that it used no intimidation, threats, excessive insistence, or pressure, and that it merely presented Dávila with an opportunity to commit the offense. Once it did so, Dávila aggressively and persistently pursued a sexual relationship first with Y.G. and then with "Vanessa." The government further avers that the break in communications between September 2007 and April 2008 happened because Puerto Rico law enforcement officials believed Dávila was outside of their jurisdiction.

-18-

With respect to this break in communication, we do not place the same significance on it as Dávila does. Following the seven-month hiatus, Dávila was quick to get back to where he started and steer his conversations with "Vanessa" toward sexual topics. Further, though the break in communication resulted in the government initiating contact with Dávila on more than one occasion, multiple solicitations of a defendant do not necessarily equal improper inducement. See United States v. Otero, 277 Fed. App'x 12, 15 (1st Cir. 2008); see also Teleguz, 492 F.3d at 84 (stating that "merely giving a defendant an opportunity to commit a crime when the government puts forth an enthusiastic and persistent buyer of illicit goods cannot be improper inducement"). Additionally, the lapses in communication were, at least in part, the result of either agent González or Dávila's not having the means to communicate, or of Dávila's being outside of law enforcement's jurisdiction. As suggested by the government, the entrapment doctrine takes into account practical problems faced by law enforcement officials. See Teleguz, 492 F.3d at 84; United States v. Luisi, 482 F.3d 43, 52 (1st Cir. 2007) (noting that significant government involvement in illegal activities is often required in the prosecution of "victimless" crimes); United States v. Bradley, 820 F.2d 3, 6 (1st Cir. 1987) (same). Finally, it is important to note that "[n]either mere solicitation nor the creation of opportunities to commit an offense comprises inducement as that term is used in entrapment

-19-

jurisprudence." United States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994).

As for Dávila's claimed reluctance, his actions speak louder than words. The ample uncontested evidence of Dávila's actions (including that he repeatedly engaged in sexually explicit conversations with minors and made multiple attempts to meet minors to engage in sexual relations with them) clearly demonstrates an eagerness to commit the crime rather than reluctance that was overcome only by inducement. It is also important to distinguish between initiating contact with someone versus suggesting that they commit a crime. Although Y.G. and "Vanessa" each initiated contact with Dávila once by sending him a new mobile phone number, neither broached the subject of engaging in a sexual relationship with him. If Dávila had indeed abandoned his criminal intent, he could have disregarded their messages, or contacted them and maintained an appropriate relationship. He chose not to do that. Instead, he not only broached the topic of engaging in sexual relations, but also followed through by attempting to meet for that purpose. Dávila went so far as to bring with him a cooler full of beer and Smirnoff drinks, consistent with his suggestion that "Vanessa" drink alcohol to relax before having sex.

Having considered the "broader record," we find that Dávila "did not make the requisite entry-level showing for an entrapment instruction." Teleguz, 492 F.3d at 85. Given that the government's communications with Dávila merely provided him with a

-20-

means to communicate with Y.G. and "Vanessa" and were not of a sexual nature, they fell short of overreaching and served merely to offer Dávila an opportunity to commit a crime. There is simply no "plus factor" here to move this investigation beyond a sting operation into the realm of improper government inducement. Id. (finding that "sting operations by their nature often involve government manipulation, solicitation, and, at times, deceit"). As no reasonable jury could conclude that there was improper government inducement, we need not consider the second factor of predisposition.[8] See Vasco, 564 F.3d at 20. The district court properly refused to instruct the jury on entrapment.

## CONCLUSION

For the foregoing reasons, we affirm the district court judgment.

---

[8] We do note that there is evidence (including Dávila's admission to "Vanessa" that he previously had sex with a fourteen-year-old), which contradicts Dávila's claim that he was not predisposed to commit the crime. See United States v. Tom, 330 F.3d 83, 90 (1st Cir. 2003); United States v. LaFreniere, 236 F.3d 41, 46 (1st Cir. 2001).

-21-