# United States Court of Appeals
## For the First Circuit

No. 19-1732

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER SAEMISCH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Thompson and Lipez, Circuit Judges,
and Torresen,[*] District Judge.

Zainabu Rumala for appellant.
Donald C. Lockhart, Assistant United States Attorney,
with whom Nathaniel R. Mendell, Acting United States Attorney, and
Jordi de Llano, Assistant United States Attorney, were on brief,
for appellee.

November 17, 2021

---

[*] Of the District of Maine, sitting by designation.

**TORRESEN, District Judge.** Defendant-Appellant Christopher Saemisch was convicted by a jury of one count of knowingly distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A). Saemisch's case arose from a ruse crafted by his prison pal, Dmitry Bron, which resulted in Saemisch sharing his collection of images of child sexual abuse[1] with Bron. But because Bron was working with law enforcement, Saemisch was promptly arrested after he sent the unlawful images to an email address controlled by agents from Homeland Security Investigations ("HSI").

At trial, Saemisch tried to pursue an entrapment defense on the theory that Bron pressured and manipulated Saemisch into sending him the unlawful images. In an effort to meet his burden of production to put that defense before the jury, Saemisch sought to introduce the testimony of Dr. Robert Weiss, a therapist and relationship specialist with a specialty in sex addiction. The district court concluded that Dr. Weiss's testimony was not relevant to Saemisch's defense and granted the Government's motion to exclude Dr. Weiss. Saemisch now challenges that ruling, arguing that the district court erred not only in excluding Dr.

---

[1] Although the statutory language speaks in terms of "child pornography," as defined in 18 U.S.C. § 2256(8), we use the term "images of child sexual abuse," unless we are directly referring to the statute, because we believe it more aptly describes the images depicted.

- 2 -

Weiss's testimony, but also in failing to allow a testimonial proffer from Dr. Weiss before doing so. Seeing no error, we affirm.

## I. Factual Background

In 1997, Saemisch pleaded guilty in the United States District Court for the Northern District of California to various child exploitation offenses. Among other things, Saemisch helped produce images of sexual abuse of a ten-year-old child, and he sexually abused a five-year-old child named Akina. Saemisch's involvement in that offense also included his use of an online chat room called the Orchid Club in which members exchanged images of child sexual abuse and discussed their sexual interest in minors. While in prison for that offense, Saemisch met Bron, who also had been convicted of various child exploitation offenses.

In 2012, Saemisch was released from prison. Bron, having been sentenced to a substantial term of imprisonment, remained incarcerated, but the two remained in touch, primarily through email.[2] Their initial communications were benign, but in early 2016, Bron steered the conversation towards child sexual abuse. Saemisch took the bait, and so began two months of illicit conversation between Bron and Saemisch about child molestation;

---

[2] Federal inmates can email individuals on an approved list through a Bureau of Prisons-run email system.

production, possession, and distribution of images of child sexual abuse; and sex trafficking.

Saemisch and Bron exchanged numerous, lengthy, and graphic emails in thinly disguised code that allowed them to pass undetected by prison authorities. For example, images of child sexual abuse are discussed as "antiques," and children are referred to as "puppies" or "vehicles."[3] The evolution of these emails, Bron's and Saemisch's level and degree of participation in these messages, and the timing of these communications are all important. We thus reproduce some of the most relevant communications and summarize others.[4]

## A.   Bron and Saemisch's Email Communications

The first relevant communications begin on February 26, 2016, when, after Saemisch mentions that he is considering a vacation in Eastern Europe, Bron responds that he knows a Ukrainian guy who could "provide Akina type entertainment [for] about 200" dollars. The next day, February 27, 2016, Saemisch asks if Bron is "serious about the Akina entertainment." Discussion about the potential trip to Ukraine continued, and on March 2, Saemisch tells Bron that he is interested in going to Ukraine, asks Bron for

---

[3]   The Defendant has never disputed the meaning of these coded words.

[4]   All typographical errors in these communications are in the originals.

advice about logistics, and tells Bron that he is going to start looking at flights. Saemisch also talks about "set[ting] up a dog training school" and how he hopes Bron's friend "has younger dogs." Consistent with his stated intent to travel to Ukraine, on March 7, 2016, Saemisch searched for two apps in the Google Play store: Packing Pro (which helps with packing for a trip) and Entrain (which helps with jet lag).

Interspersed among the conversations about traveling to Ukraine for "Akina-type entertainment" are discussions about collecting and distributing images of child sexual abuse. On February 27, 2016, less than twenty-four hours after Bron's first mention of Akina, Saemisch tells Bron that he sees "stuff from your production company all the time. Your work is still out there." Saemisch also recommends that Bron "look up Orchid Club" the next time he is in "the law library," and Saemisch offers to "dig it up again and print it and send it to you." In the next email, also on February 27, Bron states: "I assume from your message that you still collect antiques," and asks Saemisch whether he "still do[es] woodworking" himself. Saemisch responds that he is "just a bystander" in "the antique business" but that "the markets are exploding."

Just three days after Bron mentions Akina, on February 29, 2016, Saemisch tells Bron: "I am not currently refinishing furniture. I prefer to trade antiques online, no hands on.

Current technology makes it so easy to access a plethora of high quality antiques with crystal clear presentations. Business is booming." On March 2, 2016, Saemisch tells Bron:

> As far as my antique collection my warehouse is the equivalent of about 30 GB's. Easy acquisitions with cloud storage. If the antique dealers have the same cloud storage, then a click of the button- and their inventory is now in your storage. Instantly. No wait time. In fact, 25 GBs did happen that way, instantly. Pretty much all newer acquisitions, the old presentations are almost laughable compared to the new presentations. Nearly all presentations are video, from a few minutes, to over an hour apiece. It's the best way for a collector to know the exact condition of the antiques. I have not spent hardly any time working at this, so I would have much more if I actually worked at it. But I'm a cheap skate over 50 GBs storage cost money per month. But 1, 2, 3 terrabites are available. One antique dealer offered a terabite trade.. But again I'm kinda cheap…… Hope this helps. But the opportunities and possibilities are endless...... As with all business now days, there is no need to carry anything with you. You simply log on and presto, all is there. Secure sites, with encryption, keep businesses from being hacked.

On March 3, Saemisch tells Bron how concerned he is about security and how he uses a Virtual Private Network ("VPN") to hide his Internet Service Provider ("ISP"), as well as an encrypted email server. As Saemisch put it in a later email, he had "a lot of learning to do" when he first got out of prison. Saemisch also tells Bron that he uses an online videochat platform to "find people with similar interests" and that he has one person in

Germany with whom he chats.  Saemisch tells Bron that he and his German acquaintance "entertain each other for hours."

On March 15, Bron initiates a conversation with Saemisch about sex trafficking.  Bron tells Saemisch that his friend in Ukraine can "accommodate renting an Antique Akina vehicles" and that there are "premium vehicles" available in different "model years."  He also mentions that "a long term contract" would be about $400 per week.  Saemisch responds that he is interested but concerned about the price.  In response, Bron pivots and says the price would be $400 per month, not per week.  Relieved, Saemisch comments that he "thought $400 was way too high, even by American standards let alone Ukrainian Standards.  Glad to hear about the correction."  And Saemisch tells Bron that that corrected price was "Ok."

Discussion about the Ukrainian trip progressed, and Saemisch tells Bron that he is "interested in cars 2008 to 2011 or even 2012" but opines that "production was best in 2010 and 2011." And he makes clear to Bron that his primary goal for Ukraine is to produce images of child sexual abuse.

During this same time period, Saemisch also begins to tell Bron about his exploits trading images of child sexual abuse online.  On March 5, he tells Bron how there are "[m]any sites to advertise your products," that it is "[e]asy to sign up and post generic offerings," and that he uses a Russian site where "[t]hey

contact you and offers are made to trade links." On March 11, Saemisch tells Bron that "business has been booming, doubled in size over the last few days." On March 21, Saemisch tells Bron how he finds it "fun to share similar interests even if this side business is not making me a lot of money," how he thinks "you have to give in order to receive," and how "[t]hrough the years I've wanted to show off the cars I've had."

On April 4, Bron begins to plant the seeds for the sting operation that would ultimately ensnare Saemisch, telling Saemisch that "Nanny" (a pseudonym for Bron)[5] was getting a smartphone. Saemisch then responds: "Well if you're going to be in contact with our old friend nanny I might have some information I want to pass on to you concerning the business and it ought to keep him pretty occupied as well." Saemisch continues: "[W]hat I could do for [Nanny] is show him what I have been up to by having him go to a Dropbox account that I will set up." This is the first time either Saemisch or Bron discusses sending images of child sexual abuse to Bron.

A few days later, on April 8, Saemisch offers to give Bron "a tour of my warehouses" and to give him "a general idea of the business." He also explains to Bron how he rates and organizes part of his repository of images of child sexual abuse. And he

---

[5] This is a reference to Bron's online moniker (nanny69) from before he was incarcerated.

tells Bron that he plans to "set up a dropbox for nan" and that Bron will "never be the same." In the course of this discussion, Saemisch also tells Bron about an email he got from "a Russian" asking to send "your collection" and how he sent the Russian "a link."

On April 15, Saemisch emails Bron, as had now become routine, but the tone of this communication has changed from Saemisch's usual excitement to one of apprehension. Saemisch tells Bron that HSI has contacted the mother of the children he babysits. He mentions that he is "taking the usual precautions" and then signs off: "Hope you keep hearing from me...:/."

In this same vein, the following day, Saemisch again reaches out to Bron, expressing concern about being caught by law enforcement and crafting a rudimentary metaphor to explain the steps he is taking to cover his tracks:

> I know Nan will be disappointed, but I think sailing may be in order now. Its been real windy lately. I want to stay ahead of the tail winds, lest the boat take a beating. Winds get so strong, you have to throw excess weight overboard. You can replace those items at the next port, but you have to get to the port first.. The clouds will disappear until the storm passes. Then damage from the winds can be repaired. It won't be the first time I've started over. Don't worry, if I come through this, you will be greatly rewarded. I've always saved a little for rainy days. All will not be lost.

Nevertheless, after a few tense days, it appears that Saemisch is under the impression that the law enforcement threat has mostly passed, telling Bron that his computer is up and running. He continues: "Tell Nan to set up an email. I'm ready to blow him away whenever he is ready." Bron then follows up with a request for a "nice long tour" with the "[s]ame details as before," but Saemisch does not engage with this request.

On April 22, Saemisch tells Bron that he is "still laying low" since he knows he is still under investigation, and he tells Bron that "[o]nce nan transfers everything over to his hive, I may shut mine down and let him be the keeper of the bees. Then he can send me his logon info." In the course of this same conversation, after Saemisch tells Bron that he has not had sex in twenty years, Bron asks whether it is because Saemisch is only sexually interested in "puppies." Saemisch responds: "puppies is at the top of the list."

On May 1, Saemisch gives Bron some final instructions to prepare to receive Saemisch's collection of images of child sexual abuse. He tells Bron: "Have nan set up an email account as links are long strings and easier to cut and paste, might be able to cut and paste into and out of Kik [an instant messaging app], so that could be an option."

## B.    The Sting Operation

All this time, Bron had been creating a ruse. His discussion of his friend and the trip to Ukraine were made up. He was setting a trap for Saemisch, because at the same time Bron was reeling in Saemisch, he was reaching out to law enforcement. On February 28, 2016, Bron wrote a letter to his attorney outlining the idea for the ruse. Bron's attorney passed the letter on to an HSI agent in Las Vegas,[6] who contacted Special Agent Christopher Diorio in Massachusetts sometime in late March. HSI first met with Bron on April 13, 2016. That day was the first time that the Government learned about Bron's emails and the ruse that he had crafted, and the investigation was officially opened shortly thereafter. The agents then met with Bron for a second time on April 19.

On May 3, 2016, Bron and the Government[7] initiated a conversation with the Defendant via Kik. What follows is an abridged version of the conversation:

Bron/Government: What's up smashy[8]

---

[6]    The Defendant tried to admit this letter into evidence but was not successful, so it is not part of the record. While the exact date is not clear from the record, Bron's attorney first contacted HSI at some point in March 2016.

[7]    Special Agent Diorio testified that he wrote some of the Kik messages and Bron wrote others. But he made clear that none of the messages were sent without his approval.

[8]    "Smashy" is one of Bron's nicknames for Saemisch.

- 11 -

Bron/Government: This is nanny 69
                Respond

                . . . .

Saemisch: [I]f you have an email I will send
          you links

Bron/Government: Nan.Nanny2020@gmail.com

                . . . .

Saemisch: Try to go to proton.com and see if
          you can go ahead and set up a secure
          email account

                . . . .

Saemisch: [W]hen we are done for the evening
          you can go up in the upper right
          hand corner and delete this chat
          . . . .

                . . . .

Saemisch: I will send you a whole bunch of
          links and even attachments if you
          want.  Don't get bogged down with
          any one link right now.  I would
          just go through and see which ones
          you can immediately access without
          having to download individual
          files.  The last two links are mine
          the rest were links sent to me I can
          also forward some attachments I
          don't even know what they are just
          stuff people sent me to get started
          on Trading

Saemisch: But Gmail is not secure

Bron/Government: Nanny69@protonmail.com just
                finished send it all

Saemisch: Just sent you an estimated hundred
          gigs of links

Saemisch: Again the last two links are mine and the others are open right now but possibly could close at any time so if there's stuff you really like you might want to download those first I don't know next thing to do is to go to Mega NZ and open up an account

. . . .

Saemisch: Be sure to delete chat upper right-hand corner

. . . .

Saemisch: Your welcome and you'll see some of that have 4-star and 5-star folders those are mine that I've sorted so those are the good ones to start with

During this conversation, Saemisch sent to Bron (and the Government) five emails containing attachments of, and links to, images and videos of child sexual abuse. Some of these links were to a cloud storage service, mega.nz, where images and videos of child sexual abuse were stored.

C.   Saemisch's Other Exploits

In addition to evidence already discussed, the record contains evidence of Saemisch's contemporaneous activities that shows Saemisch's emails accurately reflected his thoughts and behaviors. For example, on February 4, 2016, three weeks before Bron first mentioned Akina, Saemisch searched for VPNs in the

Google Play store.[9]  And on February 18, more than a week before Bron first mentioned Akina, Saemisch conducted a search for mega.nz, the cloud storage service that he later instructed Bron to use.

One of the videos of child sexual abuse that Saemisch shared with Bron (and HSI) on mega.nz on May 3 was also found on a thumb drive in Saemisch's yard.  The video file on that thumb drive was created on February 14, 2016, almost two weeks before Bron's first mention of Akina.  It thus appears that Saemisch obtained this video file (from an unknown source) no later than February 14.

The Government also presented evidence at trial that Saemisch was exchanging images of child sexual abuse with other individuals besides Bron.  On March 20, 2016, Saemisch sent the following email to traderrmann@gmail.com: "I would be interested in knowing what you would like to trade.  Send samples."  Saemisch sent that email two weeks before he and Bron first discussed sending images of child sexual abuse to Bron.  Then, on April 4, 2016, Saemisch sent an email to a German email address (child-naked@gmx.de) saying: "I would be interested in knowing what you would like to trade.  Send samples."

---

[9]    Recall that Saemisch told Bron on March 3 that he used a VPN to hide his ISP.

The record also contains evidence that Saemisch was babysitting four young children between the ages of seven and eleven before Bron first mentioned Akina. Saemisch discusses these children in his emails to Bron with some frequency. While these portions of the emails are largely redacted in the record, there is enough in them to make clear that Saemisch was grooming the children and was focusing in on one in particular.

## II. Procedural Background

Prior to trial, the Government moved *in limine* to preclude the Defendant from asserting an entrapment defense "absent a sufficient proffer of how he intend[ed] to satisfy his burden of demonstrating its applicability." The district court granted that motion, finding that "the defendant ha[d] not adduced 'hard evidence' showing that he was 'not predisposed to commit the crime,' a necessary prerequisite to the assertion of an entrapment defense." (quoting United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009)).

On March 3, 2019, the Defendant provided an "amended summary of expert testimony" that he expected to elicit at trial from Dr. Robert Weiss (the "expert disclosure letter"). Dr. Weiss is a therapist and relationship specialist with an expertise in sex addiction, compulsivity, and digital age sex addiction. The Defendant offered that Dr. Weiss would testify about "how the human brain responds to addictive stimuli" and "that portions of the

- 15 -

brain become triggered when the topic of a person's addiction is raised." It was also expected that he would testify about "how a person feels when that portion of the brain is triggered" and about "the social isolation faced by individuals who suffer from behavioral addiction and their specific vulnerability to triggering stimuli." The Defendant made clear that he did not intend to elicit any opinions about Saemisch specifically, since Dr. Weiss did not evaluate or test Saemisch. Rather, it was expected that Dr. Weiss would testify based on his research, writing, and education in the area of behavioral addictions.

Prior to the cross-examination of the Government's final witness, the district court concluded that the Defendant's pursuit of an entrapment defense was "fruitless" because there was no possible view of the evidence that would support the "predicate conclusion that there was an absence of predisposition." Referring to the emails between Bron and Saemisch, the district court found it "abundantly clear" that the "predicate had not been established for an entrapment defense."

The district court went on to indicate that, based on the expert disclosure letter, it did not consider Dr. Weiss's testimony to be relevant. The Defendant argued that Dr. Weiss's testimony would help to prove that "but for the informant's choices to set up this entire ruse, that Mr. Saemisch may not have engaged in the one criminal act that he is actually charged with." The

district court was unpersuaded and excluded Dr. Weiss's testimony. The district court indicated that it made the ruling when it did so that the Defendant could adjust any cross-examination and presentation of direct evidence with the understanding that the entrapment instruction would not be given.

The Defendant subsequently asked the district court to reconsider its ruling and to allow him to present a "testimonial offer of proof outside of the presence of the jury" of Dr. Weiss's testimony. The district court denied this request and concluded that the expert disclosure letter was a sufficient proffer of Dr. Weiss's testimony.

Finally, before resting, the Defendant sought clarification of the district court's ruling as to Dr. Weiss. The Defendant indicated that Dr. Weiss's testimony about how someone with a sex addiction could be triggered by exposure to content related to the addiction was also relevant to how those communications would have affected Bron (as a diagnosed pedophile) and to the propriety of the Government's use of Bron as a cooperating source. The district court pointed out that how Bron would have been affected by the communications occurring throughout the ruse was both outside the Defendant's earlier proffer and was also excludable on the basis that, just as Dr. Weiss could not testify to Saemisch's individual situation, he also could not speak to Bron's personal situation.

Saemisch was ultimately convicted of knowingly distributing child pornography, and on July 16, 2019, the district court sentenced him to 360 months in prison. Saemisch timely filed this appeal.

### III. Discussion

It is against the backdrop detailed above that we review Saemisch's arguments to us on appeal. The Defendant contends that he was entitled to a jury instruction on the defense of entrapment and that the district court limited his opportunity to present this defense when it did not allow him to present a testimonial proffer from his proposed expert witness and ultimately excluded the testimony of his proposed expert altogether. Saemisch does not spend much time arguing he was ultimately entitled to the instruction on entrapment, and so, following his lead, we focus on his two-pronged evidentiary attack. We review the district court's evidentiary decisions for abuse of discretion. See United States v. Jadlowe, 628 F.3d 1, 23 (1st Cir. 2010).

### A. Defendant's Efforts to Proffer Dr. Weiss's Testimony

We begin with the Defendant's contention that it was error for the district court to refuse the Defendant's request to conduct a testimonial proffer of Dr. Weiss. To preserve a claim of error in a ruling to exclude evidence, a party need only inform the court of the substance of the evidence by an offer of proof. Fed. R. Evid. 103(a)(2). "[A]n effective offer of proof enables

- 18 -

the trial judge to make informed decisions based on the substance of the evidence."  United States v. Adams, 271 F.3d 1236, 1241 (10th Cir. 2001).  So long as a party has been allowed to provide sufficient substance of the proposed testimony to enable the trial judge to make an informed decision about the admissibility of the evidence, the decision to forgo a testimonial proffer is within the district court's broad discretion.  See United States v. Fosher, 590 F.2d 381, 382-84 (1st Cir. 1979) (affirming district court's decisions to forgo testimonial proffer and to exclude expert testimony about the reliability of eyewitness identification and concluding that district court "was entitled to rely upon the representations made in the written" description of the expert's testimony).  The expert disclosure letter provided a relatively detailed exposition of the information about which Dr. Weiss could (and could not) testify.  And it provided sufficient information for the district court to be able to assess the relevance of his testimony.

While the Defendant contends that a more detailed testimonial proffer was necessary, he has failed to identify any additional factual information that was purportedly lacking from the expert disclosure letter, either in the district court or on appeal.[10]  There is nothing to indicate that the district court

_____

[10]    At oral argument, when asked what more Dr. Weiss would have offered had his testimony been proffered, the Defendant

- 19 -

lacked sufficient information to make its ruling or that the district court was missing any material information about Dr. Weiss before granting the Government's motion to exclude his testimony. Thus, the district court did not err in declining the Defendant's request for a testimonial proffer of Dr. Weiss.

## B.    Exclusion of Dr. Weiss's Testimony

We next consider whether the district court erred by excluding Dr. Weiss's testimony.

---

contended that Dr. Weiss would have testified to the difference between predisposition and addiction. We are skeptical that this is a distinction that Dr. Weiss would have been permitted to draw, because predisposition is a legal concept that would have been beyond Dr. Weiss's purview. While he could have offered factual information that might lead to the conclusion that Saemisch was not predisposed, testifying as to whether addiction constitutes predisposition for purposes of an entrapment defense would have crossed the line. See United States v. Powers, 702 F.3d 1, 13-14 (1st Cir. 2012) ("It is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable in the case." (quoting Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997))). Further, it was clear from the thrust of the expert disclosure letter and the Defendant's accompanying argument that Dr. Weiss intended to try to draw this distinction in his testimony. It is thus evident that, prior to excluding Dr. Weiss's testimony, the district court already knew that Dr. Weiss was being offered to testify about the effect that a sex addiction would have on Saemisch's predisposition to commit the crime of distributing child pornography.

The Defendant also pointed out at oral argument that a testimonial proffer would have allowed for follow-up questions, but the Defendant has not identified anything substantive that a follow-up question may have elicited. Accordingly, we do not see what value the ability for counsel or the district court to ask follow-up questions would have added.

### 1. Legal Background

"Entrapment occurs when the criminal design originates with the" government, which "implant[s] in the mind of an innocent person the disposition to commit the alleged offense and induce[s] its commission." United States v. Dávila-Nieves, 670 F.3d 1, 9 (1st Cir. 2012) (quoting United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998)). "The defense of entrapment has two elements: (1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct." United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988).

"'Inducement' exists when the governmental deception or instigation actually implants the criminal design in the defendant's mind." Gamache, 156 F.3d at 9. "[M]erely provid[ing] an opportunity to commit a crime" is not improper inducement, although "proof of opportunity plus 'something else' may be adequate to meet a defendant's burden" to prove inducement. Id. "Examples of such 'government overreaching' include 'excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, noncriminal type of motive.'" United States v. Hinkel, 837 F.3d 111, 117 (1st Cir. 2016) (quoting United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994)). "[M]ultiple solicitations of a defendant do not necessarily equal improper inducement." Dávila-Nieves, 670 F.3d at 10. "It is also

important to distinguish between initiating contact with someone versus suggesting that they commit a crime."  Id. at 11.

Predisposition is "the principal element in the defense of entrapment" and "focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime."  Mathews v. United States, 485 U.S. 58, 63 (1988) (internal quotation marks omitted).  "[A] defendant predisposed to commit [a] crime should not get off merely because the government gave the defendant too forceful a shove along a path that the defendant would readily have taken anyway."  United States v. Acosta, 67 F.3d 334, 337–38 (1st Cir. 1995).

The question, then, is whether the "defendant would have been likely to commit the same crime without the undue pressure actually exerted."  Id. at 338.  This inquiry focuses on the defendant's predisposition before contact with the government. Gamache, 156 F.3d at 12.  "While evidence of the defendant's response to the government's inducement may be relevant to the predisposition inquiry, that evidence must be evaluated in terms of what it reveals about the defendant's readiness to commit the crime before the government contacted him."  United States v. Pérez-Rodríguez, 13 F.4th 1, 18 (1st Cir. 2021).

"In evaluating the question of whether the defendant was predisposed, the factfinder must . . . 'assume away . . . the

- 22 -

present circumstances insofar as they reveal government overreaching.'" Id. at 20 (quoting Gendron, 18 F.3d at 962). If there was no improper inducement, this task is an easy one, since we already know "how the defendant would respond to 'an ordinary opportunity to commit the crime' and any further analysis of predisposition is unnecessary." Id. (quoting Gendron, 18 F.3d at 962). "But if there was improper inducement, the nature of that inducement and the defendant's responses to it are relevant to the predisposition analysis to the extent that they allow inferences about the defendant's state of mind prior to the government's intervention." Id.

Factors to be considered in assessing whether a defendant was predisposed to commit a crime include: "(1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by the governmental persuasion; and (5) the nature of the inducement or persuasion offered by the Government." Gamache, 156 F.3d at 9-10. "The second, fourth, and fifth of these factors are also relevant to the improper inducement analysis. Thus, while improper inducement and lack of predisposition are two separate prongs, the same factual evidence

will often be relevant to both prongs." Pérez-Rodríguez, 13 F.4th at 18.

The defendant has the "modest burden of production" to introduce evidence supporting both prongs of the defense and thereby "make[] the entrapment theory 'plausible' or 'superficially reasonable.'" Id. at 18-19 (quoting Gamache, 156 F.3d at 9); accord Rodriguez, 858 F.2d at 814 ("[T]here must be some hard evidence in the record which, if believed by a rational juror, would suffice to create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he was not predisposed to commit.").[11]  "[T]his is not a very high standard to meet." Pérez-Rodríguez, 13 F.4th at 19 (quoting Gamache, 156 F.3d at 9). Moreover, the two prongs "are analytically linked in that improper inducement, and the defendant's responses to it, are part of the evidence courts should consider in deciding whether the defendant met his burden of production on the lack of predisposition prong." Id. at 20.

---

[11]   We note that, to meet that burden, "[a] defendant does not need to introduce his own evidence" and "may rely on 'evidence adduced during the government's case' or 'any probative material in the record.'"  Pérez-Rodríguez, 13 F.4th at 19 (quoting Rodriguez, 858 F.2d at 813).  The "'probative material'" may include the absence of evidence in the government's case that the defendant had previously engaged in the kind of conduct underlying the charges.  See id. at 21 ("The absence of any kind of negative character evidence relating to sexual activity with minors is one point in favor of allowing the entrapment instruction.").  Of course, in this case, there is abundant evidence of such prior conduct.

There is no exact quantum of evidence required for the defendant to meet this "modest burden," but it is not enough for the defendant to prove "mere solicitation" or "that the government afforded the defendant the opportunity for commission of the offense." Rodriguez, 858 F.2d at 813 (internal quotation marks omitted). Instead, the defendant must "produc[e] 'some evidence'" of both improper inducement and lack of predisposition that is "sufficient to raise a reasonable doubt as to whether he was an unwary innocent rather than an unwary criminal." United States v. Joost, 92 F.3d 7, 12 (1st Cir. 1996) (quoting United States v. Hernandez, 995 F.2d 307, 313 (1st Cir. 1993)).

The district court's assessment of whether the defendant has met this threshold is similar to that of assessing a motion for a judgment of acquittal; that is, the evidence must be viewed in the light most favorable to the defendant. See Rodriguez, 858 F.3d at 812. "An entrapment instruction is required if the evidence, viewed in this charitable fashion, 'furnishes an arguable basis for application of the proposed rule of law.'" Pérez-Rodríguez, 13 F.4th at 19 (quoting Rodriguez, 858 F.2d at 814).

### 2. Analysis

The district court barred Dr. Weiss's testimony after concluding that it was not relevant. The Defendant contends that Dr. Weiss's testimony was relevant to both inducement and

predisposition. We begin with inducement. This case is unique in that Bron's campaign of persuasion began before he ever came into contact with HSI. It does not appear that HSI even learned about Bron's efforts until late March or early April, and no agent of the Government met with Bron until Special Agent Diorio met with him on April 13. As defense counsel acknowledged at trial, there is no such thing as private entrapment, so the Government is not necessarily responsible for Bron's actions prior to becoming involved in the case.

The Defendant argues[12] that when the Government came into the case, it essentially adopted (and is thus responsible for) everything that Bron did beforehand. The Defendant has offered no persuasive authority to support the proposition that an entrapment instruction is warranted when someone like Bron, acting outside of and unknown to law enforcement, induces a defendant to commit a crime. We have on two prior occasions assumed the validity of the "novel theory" that governmental ratification of a private party's prior conduct can constitute entrapment, United States v. Young, 78 F.3d 758, 760 n.1 (1st Cir. 1996); Vasco, 564 F.3d at 18 n.1, and because of the content of Dr. Weiss's testimony, we need not settle this issue.

---

[12] We disagree with the Government's contention that the Defendant did not assert this argument at trial and thus waived the argument.

Dr. Weiss was expected to talk about the social isolation suffered by sex offenders, which would have helped to establish that Saemisch may have been unusually susceptible to Bron's ploy, particularly given their preexisting relationship. It is possible that with Dr. Weiss's testimony, the Defendant could have met his minimal burden of putting forward some evidence of improper inducement under the Defendant's ratification theory. But because we ultimately conclude that the Defendant failed to show evidence of a lack of predisposition, we sidestep again the question of whether the Defendant could have met his burden of production on the inducement prong under a ratification theory. See Pérez-Rodríguez, 13 F.4th at 19 ("Because the defendant is required to meet the burden of production on both prongs, a court may deny an entrapment instruction based on a failure to show evidence on one prong or the other, without discussing both.").

As to the predisposition prong, the Defendant contends that Dr. Weiss would have testified about the difference between addiction and predisposition, presumably to give credence to the argument that because Saemisch was an addict, he would not have engaged in the scheme had he not been triggered by Bron's mention of Akina in February 2016. However, the district court rejected the proffered testimony as irrelevant after finding that Saemisch could not possibly establish a lack of predisposition – i.e., that Dr. Weiss's testimony could not offset the Government's evidence

of predisposition. The court indicated that its ruling took into account that Dr. Weiss had not examined Saemisch and therefore would not be able to address his individual circumstances. We find no abuse of discretion in the court's exclusion of Dr. Weiss's testimony on relevancy grounds. As we shall explain, the record contains substantial evidence showing that Saemisch <u>was</u> predisposed to commit the crime of distributing images of child sexual abuse. In addition, while he was communicating with Bron, he was simultaneously discussing trading images of child sexual abuse with other individuals. In evaluating the factors that are useful in the predisposition analysis, Saemisch checks every box.

### a. Character or Reputation of the Defendant

Evidence as to this factor "might include prior criminal convictions for similar offenses or a history of sexual interest in minors." <u>Id.</u> at 21. Saemisch has a long history of possessing and distributing images of child sexual abuse. He was convicted in 1997 for crimes involving molestation and production and distribution of child pornography. And the evidence admitted at trial demonstrates that his criminal behavior continued after his release from prison.

In addition, "evidence of predisposition may be inferred from conversations in which a defendant displays knowledge or experience in the criminal activity under investigation." <u>United States</u> v. <u>Tom</u>, 330 F.3d 83, 90 (1st Cir. 2003). That knowledge

- 28 -

and experience were on display in Saemisch's communications. While the Defendant seeks to paint Bron as the puppet master in their relationship, it is clear from their communications that it was Saemisch pulling the strings. Saemisch discussed concealing his activities and images using a VPN, secure email servers, and cloud storage, as well as eliminating communication threads as soon as the conversation concluded. Saemisch and Bron's communications also reflected Saemisch's knowledge of the norms of distributing images of sexual abuse and even sex trafficking – as reflected, inter alia, in his communications about the high prices in Ukraine.[13]

### b. Initial Suggestion of Criminal Activity

While Bron was the first one to mention Akina, it was Saemisch who first initiated conversation about distributing images of child sexual abuse. And Saemisch was also the one who proposed sending images of child sexual abuse to Bron. Not only this, but after Saemisch learned that he was under investigation, he proposed "transfer[ring] everything over" to Bron, shutting his storage sites down, and allowing Bron to "be the keeper of the bees," while still allowing Saemisch access to the transferred links. At this point in time, Saemisch's motive for sending Bron

---

[13] Saemisch also argues that his emails to Bron must be taken with a grain of salt because he was engaging in significant puffery. But the Defendant does not point to any evidence of this, such as anything that he said to Bron that is provably false.

his collection of images of child sexual abuse was not benevolence, but self-preservation.  He wanted to protect himself while still being able to maintain access to something from which he derived enjoyment.

### c.    Engaging in the Criminal Activity for Profit

There is some indication that Saemisch may have been selling images of child sexual abuse.  In his communications with Bron, Saemisch made frequent references to commercial terms like "business" or "advertising," but it is difficult to know whether he was speaking purely in code or whether he was accurately describing his behavior.  In one exchange, though, Saemisch referred to distributing images of child sexual abuse as a "side business" and said that it was not making him "a lot of money." And not making "a lot of money" seems to indicate he was making some money.

Regardless of the financial profit, it is very clear that Saemisch was distributing images of child sexual abuse separate and apart from his involvement with Bron.  And it is equally clear that even if Saemisch was not receiving money for the images he was trading, he was profiting by expanding his collection of images.

He discussed "trad[ing] antiques"; how he "find[s] people with similar interests" online and they "entertain each other for hours"; "advertis[ing] . . . products," "post[ing]

- 30 -

generic offerings," and receiving "offers . . . to trade links"; and "show[ing] off the cars [he's] had."  Saemisch also sent emails to two individuals about trading images, including one two weeks before Saemisch first raised the prospect of sending images of child sexual abuse to Bron.[14]  All of this makes clear that Saemisch was engaged in distributing images of child sexual abuse because he wanted to receive images in return.

### d.   Reluctance to Commit the Offense

Saemisch demonstrated no reluctance to distribute images of child sexual abuse to Bron, at least not until he realized that he was being investigated.  As soon as Bron told Saemisch that he was getting a smartphone, Saemisch proposed passing on "some information . . . concerning the business" that would keep Bron "pretty occupied."  Saemisch also seemed to derive pleasure from the idea of sending Bron his collection.

---

[14]   At times in the district court and in the briefing on appeal, the Defendant appears to make the spurious and unsupported argument that Saemisch was not predisposed to distributing images of child sexual abuse to Bron in particular.  The question is whether the Defendant was predisposed to commit the particular type of crime, not the specific criminal act in which he engaged. See Joost, 92 F.3d at 12 ("The [entrapment defense] protects both citizens who are completely law abiding and those who have violated laws but whose unreadiness to commit a particular type of crime was overcome by excessive governmental efforts."); cf. Mathews, 485 U.S. at 63 ("Predisposition . . . focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime.").

Although Saemisch tries to portray himself as being easily manipulated, that is not accurate. When he knew he was being investigated by HSI, he took a step back, which is indicative of someone very much in control. He contemplated offloading his contraband collection to Bron while still maintaining access to it. And there are times in the emails when Bron tried to pump Saemisch for information, but Saemisch did not take the bait, particularly once Saemisch knew that HSI had begun to ask questions.

### e.    Nature of the Inducement or Persuasion

This factor hearkens "back to the improper inducement analysis," Pérez-Rodríguez, 13 F.4th at 23, although, in this case, that analysis was mooted by our assumption that the Defendant could have met his burden to introduce some evidence of improper inducement. With that assumption in mind, we examine the nature of Bron's efforts to ensnare Saemisch, even before the Government became aware of his covert operation. In reviewing the record as a whole, we are not convinced that Bron's efforts crossed a line. Bron created a ruse and strung Saemisch along, to be sure, but he never overtly pressured Saemisch. It is true that "[e]ven very subtle governmental pressure, if skillfully applied, can amount to inducement." Id. at 17 (quoting United States v. Poehlman, 217 F.3d 692, 701 (9th Cir. 2000)). But it is difficult to characterize Bron's passive approach as pressure at all.

Bron repeatedly took a light touch with Saemisch, apologizing for all of his questions or for bugging him, and telling him that he would leave him alone. The strategy of not wanting to come on too strong is an obvious one, but it is difficult to see it as crossing a line. It is Saemisch who was the more sophisticated party here, and he was always in control.

It is also significant that while Bron is the one who first brought up Akina and steered his communications with Saemisch down a sexual path, it was Saemisch who first brought up the distribution of images of child sexual abuse in general.[15] It was also Saemisch who first brought up the idea of distributing images of child sexual abuse to Bron in particular. While there might be some argument that Bron's inducement of Saemisch to engage in "Akina-type entertainment" (i.e., sex trafficking) might have come nearer to entrapment (assuming the viability of the government-ratification theory), Saemisch was charged with distribution of child pornography rather than a contact offense.

In sum, we agree with the district court that the Government's evidence of predisposition is so weighty that, even

---

[15] The Defendant cites to a Seventh Circuit case, United States v. Mayfield, 771 F.3d 417, 435 (7th Cir. 2014) (en banc), for the proposition that a drug addict's "inclination or urge to obtain narcotics" is not enough to demonstrate predisposition to distribute drugs. The distinction is an important one, but it is not helpful to the Defendant, who went beyond whatever inclinations and urges he had to view images of child sexual abuse to being heavily involved in distributing such images.

if Dr. Weiss had been allowed to testify, no reasonable juror could have found that Saemisch was not predisposed to commit the charged offense. Accordingly, the district court did not abuse its discretion in excluding Dr. Weiss's testimony on the ground that it was not relevant.

## IV. <u>Conclusion</u>

We **<u>affirm</u>** Saemisch's conviction.